# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **MICREL, INC.,** | ) | **Case No.  1:02 CV 2539** |
| | ) | |
| **Plaintiff,** | ) | **Judge Dan Aaron Polster** |
| | ) | |
| **vs.** | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| **TRW, INC., dba TRW AUTOMOTIVE,** | ) | |
| **ELECTRONICS GROUP,** | ) | |
| | ) | |
| **Defendant.** | ) | |

Before the Court are the following dispositive motions:

1.      Defendant TRW Automotive US LLC's ("TRW") Renewed Motion for Summary Judgment on all Claims Relating to the 1998 Agreement or Pre-October 2001 Claims ("First Motion") (**ECF No. 60**); and

2.      TRW Automotive US LLC's Second Motion for Summary Judgment, Seeking Dismissal of the Fifth, Seventh, and Ninth Claims in Micrel's Complaint ("Second Motion") (**ECF No. 61**).

Also before the Court is a nondispositive motion, i.e., Micrel's Motion to Strike Evidence Submitted in

Support of TRW's Second and Renewed Motions for Summary Judgment (**ECF No. 73**).  In this

Motion, Micrel asks the Court to strike the Affidavit of TRW's Director of Safety Electronics

Engineering and Product Analysis Jeff Rochette because it does not contain evidence sufficient to

support a finding that he has personal knowledge of the matters contained therein, and because it includes improper opinion testimony and legal conclusions. *Id*., at 1.  Micrel also argues that the documents and deposition excerpts TRW submitted in support of its motions should be stricken because TRW did not properly authenticate them. *Id*., at 2.  Finally, Micrel argues that TRW failed to properly cite the page and line numbers of its deposition excerpts, and that it mischaracterized the evidence. *Id*., at 2-4.

        In response, TRW contends that the Rochette Affidavit is proper fact and opinion testimony of a lay witness and is admissible under Fed. R. Evid. 701. *ECF No*. 76, at 2-4.  Moreover, the submitted exhibits and deposition excerpts are authentic either because they have been authenticated by Micrel or are true and accurate copies of records that TRW maintained in the regular course of business, or damage summaries created from business records and information that has been discussed during depositions. *Id*., at 4-6.  In any event, TRW has attached true and accurate copies of the court reporter's certification for each deposition excerpt it submitted in support of its motion to its response brief. *Id*., at 8.  Finally, TRW admits that it incorrectly referenced one deposition page because it was working from draft deposition transcripts and it did not get a final transcript until shortly before the motions were due.  Micrel did not file a reply brief.

        The Court concludes that, for the reasons set forth in TRW's response brief, ECF No. 76, the Motion to Strike (**ECF No. 73**) is hereby **DENIED**.

        The Court has reviewed the dispositive motions, *ECF Nos. 60, 61*, the opposition briefs, *ECF Nos. 67, 68*, the reply briefs, *ECF Nos. 74, 75*, and the evidence attached thereto and concludes, for the following reasons, that judgment must be **GRANTED** in favor of TRW on all of

Micrel's outstanding claims except Claim Nine, which alleges that TRW breached the 2001

Agreements.

## I.    FACTS[1]

Among numerous other business ventures, TRW sells Occupant Restraint Controllers,

or airbag control modules, to various automobile manufacturers, including Toyota, DaimlerChrysler and

Honda.  Airbag control modules are safety-critical devices which, for obvious reasons, are subject to

recalls and lawsuits if they fail to perform properly.  The modules are comprised of various

components, including three application-specific integrated circuits ("ASICs") known as a "dual squib,"

a "quad squib" and a "power supply."  Micrel is in the business of designing and manufacturing ASICs

to its customers' specifications.

In 1997, TRW's Automotive Electronics Group approached Micrel to quote prices for

the design and production of these three ASICs which, up to that time, TRW had been purchasing from

National Semiconductor ("National").  Because National was the sole supplier of these particular

ASICs, it was able to control the price, and TRW sought another supplier to reduce its costs.  TRW

conveyed to Micrel that the ASICs Micrel would be developing were to be "drop-in replacements" for

the National parts.  A "drop-in replacement" means that you can remove the existing part, drop in the

new part, and it will have the same form, fit, function and pass all the tests as the original.  Following

negotiations, TRW and Micrel executed a single agreement entitled the ASIC Development/Purchase

_____

[1]Unless otherwise noted, the Court recounts the facts as alleged by Micrel.  *See Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("[on] summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.") (citations omitted).

Contract.  Although the agreement is dated December 19, 1997, it was not fully executed until January 1998 and will hereafter be referenced as "the 1998 Agreement."

Under the 1998 Agreement, Micrel agreed to design the three ASICs to TRW's specifications and TRW agreed, if the ASICs conformed to the specifications, to purchase one hundred percent of its ASIC requirements from Micrel through at least 2002, at pre-determined prices. Attached to the 1998 Agreement is the initial design schedule which was originally estimated to be completed by the end of 1999.  Production was to begin in the first quarter of 2000.  The Agreement contemplated that TRW could make changes to its specifications and Micrel would promptly implement such changes.  If any change caused an increase in the time required for the performance of the development schedule, the Agreement required Micrel to promptly notify TRW in writing.  "In such event, an equitable adjustment will be made in the prices or delivery schedule or both, and this Agreement will be modified by a written amendment . . . to reflect such mutually agreed upon equitable adjustment."  *1998 Agreement* ¶ 11(B).  However, "[n]o modification of this Agreement will be binding upon either Party unless such modification is in writing and signed by authorized representatives of both Parties."  *Id*. ¶ 20.

Micrel commenced design work on the three ASICs in early 1998.  The parties experienced several delays in the development of the ASICs.  In March 2000, after agreeing to numerous schedule modifications, TRW sent a letter to Micrel relating its concern that Micrel had failed to timely perform its obligations under the 1998 Agreement, requiring termination of that Agreement. Micrel responded that TRW's termination was "wrongful," violated the termination provisions of the 1998 Agreement, and threatened to sue TRW for damages.  The parties tried to resolve their dispute

through a mediation proceeding held in the summer of 2000.  Although the mediation was unsuccessful, the parties continued to hold face-to-face meetings and negotiations in an effort to find an alternative to litigation.

In March 2001, the parties agreed to discuss a proposal that TRW purchase other, non-ASIC, products from Micrel to help the latter recover its lost profits from the breakdown of the 1998 Agreement.  At some point during negotiations, Micrel mentioned that it was a shame that the parties' relationship broke down so close to completion of the ASICs project and TRW conveyed to Micrel that TRW was an acquisition candidate desirous of getting the potential lawsuit off its books. Ronald Muckley, Vice President of TRW's Safety Electronics Division, advanced the idea that the parties resume their 1998 Agreement.  Micrel conveyed to TRW that TRW would have to purchase substantial amounts of Micrel's ASICs in order for Micrel to release its claims against TRW.  Muckley agreed to arrange the preparation of estimated volumes of TRW's customers' future ASIC requirements through 2007.

In May 2001, TRW represented certain sales estimates to Micrel for the years 2002 through 2004, but refused to provide any further estimates as it would stretch TRW's planning process. TRW informed Micrel that it was soliciting the development of advanced ASICs ("next-generation ASICs") from other suppliers, but that the introduction of next-generation ASICs would have little impact on the sale of current-generation ASICs which Micrel would be developing.  TRW represented that its requirements for Micrel's ASICs through 2007 would at worst decline slowly for each year and would not "fall off a cliff" with the introduction of the next-generation ASICs.  During negotiations,

Micrel sought unsuccessfully to make minimum sales volumes a condition of its release of claims against TRW, but TRW steadfastly refused to guarantee a minimum volume of sales.

On October 10, 2001, the parties entered into the following three contracts: (1) the 2001 ASIC  Development Agreement, (2) the 2001ASIC Supply Agreement, and (3) a Settlement Agreement and Mutual Release (collectively, "the 2001 Agreements").  Each of the 2001 Agreements contained integration clauses which purported to constitute the complete agreement of the parties with respect to the subject matter contained therein and which superseded all prior agreements between the parties.

Under the 2001 Development Agreement, Micrel agreed to complete the design of the three ASICs to TRW's specifications, and TRW agreed, if the ASICs conformed to the specifications, to purchase its requirements from Micrel at certain pre-determined prices.  *2001 Development Agreement* at 1.  Attached to the 2001 Development Agreement at Exhibit 1 is the development schedule which contemplated that the production release date for the three ASICs would occur in the third week of June 2002.  According to the Agreement,

> the schedule may be modified from time to time in order to accommodate the ASIC design process in a commercially [sic] manner. No other version, update, and/or supplement of the Schedule shall be incorporated into this Agreement unless it has been approved in writing by both Parties.  Approval in writing shall include the following: [Micrel] may transmit electronically or otherwise in writing to [TRW] a proposed modification to the Schedule which shall become part of the Schedule unless [TRW] objects by electronic communication or otherwise in writing with fifteen (15) days of receipt of the proposed communication.  . . .

*Id*. ¶ 1(D).  The Development Agreement required Micrel to conduct various tests on its products, and

-6-

to produce up to 1500 units to be used for testing by TRW.  *See generally id*. ¶ 3(A).  The Agreement

required TRW to promptly conduct module level testing on those units and report the results to Micrel.

*Id.* ¶ 3(B)(2).  It also required TRW to use commercially reasonable efforts to qualify the ASICs for

use in TRW's customer applications.  *Id.*  TRW expressly reserved the right to make changes to its

specifications, which changes "shall be in writing and signed by both Parties," while Micrel agreed to

"promptly implement such changes, subject to feasibility."  *2001 Development Agreement* ¶ 7(A).  If

any change caused an increase in the time required for the performance of the development schedule,

the Agreement required Micrel to promptly notify TRW in writing.  *Id.*  "In such event, an equitable

adjustment will be made in the prices or delivery schedule or both, and this Agreement will be modified

by a written amendment (in accordance with Paragraph 16) to reflect such mutually agreed upon

equitable adjustment."  *Id.* Under Paragraph 16, "[n]o modification of this Agreement will be binding

upon either Party unless such modification is in writing and signed by authorized representatives of both

Parties."  *Id.*

The sales volume estimates which TRW prepared for calendar years 2002 through

2004 and reviewed with Micrel during the parties' negotiations, were incorporated into the 2001

Supply Agreement at Exhibit 5 and are reproduced below:

| Description | CY 2002 | CY 2003 | CY 2004 |
|---|---|---|---|
| Power Supply | 1,440,000 | 1,395,000 | 810,000 |
| Dual Squib | 900,000 | 1,485,000 | 1,260,000 |
| Quad Squib | 2,160,000 | 3,262,500 | 3,375,000 |

*ECF No. 71, Ex. 297, TRW1 000420*.  According to paragraph 3(A) of the 2001 Supply Agreement,

-7-

these estimates were "based on historic purchasing levels for airbag modules." *Id*.  Actual sales,

however, would depend on the following factors:  "If [Micrel] completes all development obligations

under the ASIC Development Agreement, [TRW] will purchase production quantities of the Product

from [Micrel] as [TRW] has requirements for the Product and at the prices set forth in Paragraph 4(A).

However, this obligation is not, and will not be construed as a proscription against [TRW] purchasing

next generation ASICs, or ASICs for other applications, from another supplier."  "[TRW]'s

commitment to purchase Product from [Micrel] is at all times conditioned on [Micrel] being competitive

in terms of price, quality, delivery, technology and service."  "[TRW] will purchase from [Micrel] 100%

of its requirements for the Product provided that the Product conforms to the Specifications and has

been approved for use in production by [TRW]'s customers."  "Upon successful completion of

[Micrel]'s internal qualification, [TRW] will discuss with [Micrel] commitments regarding production

introduction of the Products and will provide production forecasts which are based on [TRW]'s

customer forecasts at that time.  [TRW] cannot guarantee that customers will accept airbag modules

from [TRW] consistent with historic levels.  However, [TRW] will use reasonable commercial efforts in

connection with [Micrel], to cause [TRW]'s customers to approve the use of airbag modules that

incorporate [Micrel]'s Product."  "Notwithstanding anything in this Agreement to the contrary, TRW

will only be obligated to purchase Product if it has orders from its customers for airbag modules that

incorporate [Micrel]'s Products.  [Micrel] recognizes that the ultimate decision whether to purchase

airbag modules that incorporate the Products lies with [TRW]'s customers."  *2001 Supply Agreement*

¶ 3(A).

Within a few months after the 2001 Agreements were signed, the relationship between the parties soured yet again.  According to Micrel, TRW demanded that the ASICs be re-designed to meet testing requirements not specified in the contract, setting Micrel's design efforts back months.  Micrel also claims that TRW failed to promptly test the parts which Micrel sent to it.  According to TRW, Micrel failed to supply the quantity or quality of parts necessary for TRW to conduct proper testing.

Again, the design schedule suffered delays.  By May 3, 2002, Micrel's internal projections showed that, instead of meeting the June 2002 production release date, the parts would not be ready for production "until October (quad), November (dual) and December (power supply) 2002."  *ECF No. 63, Ex. 450*.  On May 8, 2002, Micrel sent an e-mail to TRW projecting that none of the parts would be ready for production before December 2002.  *Id., Ex. 451*.  Then, on May 14, 2002, Micrel submitted another revised schedule to TRW which proposed to extend the production release date to early 2003.  *ECF No. 63, Ex. 452*.

On May 29, 2002, TRW sent Micrel a letter stating that it would not agree to any further schedule delays and that TRW considered Micrel to be in breach of the 2001 Development Agreement.  *ECF No. 63, Ex. 453*.  TRW noted that under the Agreement, Micrel was entitled to a mutually agreed-upon time to correct the deficiencies.  *Id*.  TRW also noted that if the parties agreed to use Micrel's latest proposed design schedule as the mutually agreed upon period of time to correct,

> the earliest next Production Validation qualification build opportunity
> would be in January or February 2003.  This would most likely equate
> to a best-case production volume start opportunity of July or August
> 2003 for Micrel.  Furthermore, as noted in my letters of March 13 and
> April 11, 2002, several TRW customers are requiring new design

features for Model Year 2004, such as cross-coupling, that would not permit us to use Micrel ASICs for those applications.  Thus, based on a best-case scenario, TRW would see the following estimated production potential remaining for the Micrel product if we were to agree to use the latest proposed Micrel schedule as the mutually agreed upon period to correct under the Development Agreement:

|                       | CY 2003    | CY 2004    |
|-----------------------|------------|------------|
| Power Supply (151444) | 274,000    | 302,000    |
| Dual Squib (151442)   | 207,000    | 216,000    |
| Quad Squib (151443)   | 1,289, 000 | 1,594,000  |

If, however, Micrel were unable [to] meet the dates set forth in its latest proposed schedule or any of the other contractual requirements, including the specifications, TRW would consider the termination effective immediately.

Please let me know if Micrel will agree to accept its latest proposed schedule as the mutually agreed upon period of time to correct the deficiencies under the Development Agreement. . . .

*Id.*

After consideration and further communications with TRW, Micrel ceased development efforts and filed the present action on December 27, 2002, claiming that it relied on TRW's estimates and representations in agreeing to release its earlier claims, and that TRW entered the Agreements only to use them as leverage in its price negotiations with National.  Specifically, Micrel's complaint alleged the following claims targeting TRW's pre- and post-October 2001 Release conduct:  fraud in the inducement (Claim One); rescission for failure of consideration (Claim Two); rescission due to mutual mistake (Claim Three); breach of the 1998 Agreement (Claim Four); quantum meruit (Claim Five);

-10-

breach of oral contract (Claim Six); unjust enrichment (Claim Seven); estoppel (Claim Eight); and

breach of the 2001 Agreements (Claim Nine).

TRW subsequently filed counterclaims against Micrel arising from the 2001

Agreements, namely:  breach of the 2001 Agreements (First Cause of Action), breach of the Release

(Second Cause of Action), breach of express warranties (Third Cause of Action), breach of implied

warranty of merchantability (Fourth Cause of Action), breach of implied warranty of

fitness for purpose (Fifth Cause of Action), and a request for declaratory judgment (Sixth Cause of

Action).

On April 18, 2003, TRW filed a motion for summary judgment as to Claims One

through Eight of Micrel's Complaint.  *ECF No. 19*.  On August 27, 2003, the Court issued a

Memorandum of Opinion and Order granting summary judgment in TRW's favor with respect to

Claims Two and Three, *see ECF No. 38*, at 11-15, and granting partial summary judgment in TRW's

favor on claims Five and Seven, *see id*., at 16.[2]  The Court denied TRW's motion for summary

judgment as to Claims One, Four, Six, and Eight.  TRW now moves for summary judgment on all

remaining claims.  Accordingly, the claims under consideration for summary judgment purposes are

Claims One, Four, Five (partial), Six, Seven (partial), Eight and Nine.

After completing discovery, TRW filed the pending dispositive motions seeking

dismissal of Micrel's remaining claims.  TRW is the only party to file dispositive motions.

---

[2]TRW was granted summary judgment on Claims Five and Seven to the extent these Claims
related to the 1998 agreement or pre-release matters.

## II.    STANDARD OF REVIEW

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  The court is to determine "whether there is the need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of pleadings, depositions, answers to interrogatories, admissions on file, and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant meets that burden, then the burden shifts to the adverse party to set forth specific facts that demonstrate a genuine issue for trial. *Anderson*, 477 U.S. at 250.

A genuine issue of material fact does not exist when a party which bears the burden of proof at trial fails to establish the existence of an essential element of its case. *Celotex*, 477 U.S. at 322.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48 (emphasis in original).  In order for there to be a genuine issue for trial, there must be sufficient evidence favoring the nonmoving party for a

jury to return a verdict for that party.  *Id.* at 249.  The Court now turns to the merits of TRW's motion

for summary judgment as to each of the eight claims.

## III.    ANALYSIS

On October 10, 2001, the parties entered a Settlement Agreement and Mutual Release

wherein they released each other "from any and all manner of actions, . . . whether known or unknown,

of any nature whatsoever that have been made or could have been made regarding any claims,

counterclaims or cross-claims, whether asserted or not, existing or occurring at any time prior to the

date of this Agreement and Release."  *Release* ¶¶ 1-2 (emphasis added).  Micrel's pending claims that

are based on conduct by TRW occurring prior to the execution of the Release (Claims One, Four, Six

and Eight) must be dismissed unless Micrel can establish that the 2001 Agreements were fraudulently

procured.  Accordingly, the Court will address Micrel's fraudulent inducement claim first.

### A.    Claim One:    Fraudulent Inducement

To establish a claim for fraudulent inducement to contract, a plaintiff must show

sufficient evidence of (1) a false representation of fact or, in the face of a duty to disclose, concealment

of a fact, material to the transaction; (2) knowledge of falsity of the representation or utter disregard for

its truthfulness; (3) an intent to induce reliance on the representation;

(4) justifiable reliance upon the representation under circumstances manifesting a right to rely, and (5)

injury proximately caused by the reliance."  *Metropolitan Life Ins. Co. v. Triskett III, Inc.*, 97 Ohio

App.3d 228, 235 (1994); *Gouge v. Bax Global Inc.*, 252 F.Supp.2d 509, 515 (N.D. Ohio 2003).

In *Moore, Owen, Thomas & Co. v. L. Coleman Coffey*, the Sixth Circuit held that "[w]here the

allegation is fraud, summary judgment may be granted unless there is sufficient probative evidence

-13-

produced which, if believed, would clearly and convincingly establish fraud."  992 F.2d 1439, 1446 (6th Cir. 1993).  Where the nonmoving party must meet a higher burden of proof than usual, that party must meet the same burden in resisting the summary judgment motion."  *Street v. J.C. Bradford and Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989).

            To state a claim for fraudulent inducement, Micrel must allege "a representation capable of constituting fraud."  *Gouge*, 252 F.Supp.2d at 515.  "The general rule is that fraud cannot be predicated on a representation concerning a future event."  *Link v. Leadworks Corp.*, 79 Ohio App.3d 735, 742 (1992); *Tibbs v. Nat'l Homes Constr. Corp.*, 52 Ohio App.2d 281, 286 (1977). Such representations are more in the nature of "predictions or opinions" about what the future may hold.  *Gouge*, 252 F.Supp.2d at 515 (citing *Yo-Can, Inc. v. The Yogurt Exchange, Inc.*, 149 Ohio App.3d 513, 526 (2002), in turn citing *Link*, 79 Ohio App.3d at 742)). "A promise made with the present intention not to perform, however, is a misrepresentation of an existing fact even if the promised performance is to occur in the future."  *Gouge*, 252 F.Supp.2d at 515 (citations omitted); *Link*, 79 Ohio App.3d at 742.  It is not enough to show that defendant made a misrepresentation, but that it did so "with knowledge of its falsity, or with utter disregard and recklessness regarding its truth or falsity."  *Gouge*, 252 F.Supp.2d at 516 (citing *Yo-Can*, 149 Ohio App.3d at 525).

### 1.      False Representations

            Micrel's primary argument here is its contention that in the negotiations leading up to the 2001 Agreements, TRW intentionally misrepresented and <u>overstated</u> its estimated sales volume for Micrel's ASICs for the sole purpose of inducing Micrel to release its claims under the 1998

-14-

Agreement.  Specifically, Micrel claims that TRW provided Micrel with "specific quantities" of ASICs for each of the years 2002 through 2004 and represented that the quantities through 2007 would at worst decline slowly for each year and would not "fall off a cliff" with the introduction of next-generation ASICs; TRW assured Micrel that the quantities Micrel used for its own projections for 2005 and 2006 were reasonable and, if anything, too conservative; and TRW told Micrel that the estimates were "generally accurate." *ECF No. 67*, at 14-15.  The Court concludes that Micrel has failed to establish that TRW's representations in this regard were incorrect or falsely made, for the following reasons.

First, estimates are not representations capable of constituting fraud.  *Gouge*, 252 F.Supp.2d at 516.  They are predictions of the future which are, by definition, opinions or rough calculations.[3]  Thus, as a matter of law, they are not representations of fact.  *Id*.  Nor, as a matter of law, can they be reasonably relied upon in a claim alleging fraudulent inducement to contract.  *Id*. (citing *J.B. Colt Co. v. Wasson*, 15 Ohio App. 484, 487 (1922)).

Second, it is undisputed that TRW's requirements in fact <u>exceeded</u> the estimates it generated in Exhibit 5 of the 2001 Supply Agreement, and that it continues to purchase these ASICs from National, at higher prices than it would have paid Micrel, to this day.  It is also undisputed that, in 2002, TRW purchased more than 7.1 million total ASICS from National (versus the estimated 4.5 million ASICs), and in 2003, TRW purchased more than 6.8 million ASICs from National (versus the

---

[3]According to The American Heritage Dictionary of the English Language, an "estimate" is, among other things, a tentative evaluation or rough calculation; a judgment based upon one's impressions; an opinion.  According to Dictionary.com, an "estimate" is, among other things, a tentative evaluation or rough calculation, as of worth, quantity, or size; a judgment based on one's impressions, an opinion.

-15-

estimated 6,142,500 ASICs).  *See ECF No. 63, Exs. 517, 518*.  As of June 24, 2004, TRW

purchased more than 4 million total ASICs from National, and was on target to exceed the 5.4 million

total ASICs estimated to Micrel.  *Id., Ex. 517*.  Thus, Micrel cannot claim that it was induced to enter

the 2001 Agreements on the basis of artificially inflated figures.

Third, the 2001 Supply Agreement makes clear that the estimates located at Exhibit 5,

which were expressly based on TRW's historic purchasing levels for airbag modules, were estimates

only.  The Agreement expressly cautioned that there was no guarantee that TRW's customers would

continue to purchase TRW's modules in numbers consistent with past purchasing levels.  It is also

undisputed that, during contract negotiations, TRW refused to guarantee any minimum purchases.  The

Agreement is clear that TRW's actual requirements would depend on numerous factors such as

conformance of Micrel's ASICs to TRW's specifications, completion of Micrel's obligations under the

Development Agreement (including its own testing obligations), Micrel's continued competitiveness in

terms of price, quality, delivery and service, and, ultimately, the approval of TRW's customers.

Indeed, in an internal

e-mail dated May 30, 2002, Micrel admits that TRW never promised to purchase a specific quantity of

ASICs from Micrel:

> TRW has never given a firm commitment to buy any Micrel product
> once qualified.  The sole decision whether to purchase Micrel product
> as a module cost savings is in the hands of TRW's customers.  If
> TRW's customers determine that the cost savings do not justify the
> added risk of a new vendor with only 1.5 years of production left, then
> Micrel will not see any volumes (even with fully qualified final Si).

-16-

*See ECF No. 63, Ex. 454*.  Thus, Micrel cannot now claim that it was induced to release its claims

against TRW based on TRW's promise to purchase a certain quantity of ASICs from Micrel.

Fourth, the 2001 Agreements all contain integration clauses purporting to contain the

entire agreement of the parties, and expressly superseding all prior agreements or representations of the

parties with respect to the subject matter therein.  Because the plain language of the 2001 Supply

Agreement unequivocally shows that the volume estimates located at Exhibit 5 were just that –

estimates – and that TRW's actual requirements would depend on a myriad of defined factors, the

Court concludes that any representations the parties made on these matters during negotiations

preceding the execution of the 2001 Agreements were superseded by the express representations

unambiguously set forth within the Agreements.

In short, after the conclusion of discovery, Micrel has failed to establish that TRW's

representations regarding its projected sales volumes were misrepresentations of fact falsely or

recklessly made.

Next, Micrel contends that in order to induce Micrel to release its claims arising from

the 1998 Agreement, TRW falsely represented that there were no "windows" which Micrel needed to

meet to get its parts qualified by TRW's customers.  However, it is undisputed that there was a

development schedule which required testing by Micrel and TRW and customer approval before

Micrel's ASICs could be incorporated in the airbag modules TRW sold to its customers.  *See TRW*

*205 ("2001 Development Agreement"), Exs. 1-5*.  It only stands to reason that if the ASICs were

not developed to specification, failed to pass certain tests in a certain period of time, and were unable

to be released for production until early 2003, that Micrel and TRW would both lose business

opportunities. Indeed, subsequent to the execution of the 2001 Agreements, Micrel acknowledged that "schedule slips" would impact potential production volumes and result in missed opportunities. *ECF No. 63, Ex. 447.*

Micrel also argues that in order to induce Micrel to release its earlier claims, TRW represented that it had more flexibility with its customers, that it would work with Micrel to ensure that Micrel's ASICs would be qualified for use in airbag modules, and that it would go to its customers to justify changing components in its modules. *ECF No. 67*, at 15. According to Micrel, TRW had no present intention of performing these promises when they were made. However, Micrel has produced no evidence that TRW lied when it made these statements. Indeed, these alleged representations are no more than TRW's express promises, in the 2001 Agreements, to use commercially reasonable efforts to qualify Micrel's parts and to secure its customers' approval of these parts. The Sixth Circuit has held that,

> [i]n any breach of contract case where one party refused to continue performance, the other party can always allege that the non-performing party entered into the contract with the specific intent to discontinue performance prior to the completion of the contract. Such an allegation, however, is merely speculation on the part of the aggrieved party, and the plaintiff cannot simply rely on the defendants' repudiation of the contract as evidence of a preconceived plan to defraud.

*Schneider v. Qualters*, No. 87-3405, 1988 WL 76524 (6th Cir. Jul. 21, 1988). The question of whether TRW <u>in fact</u> used commercially reasonable efforts to qualify Micrel's ASICs and to obtain customer approval for those ASICs after the 2001 Agreements were executed is another matter (and will be discussed below with respect to Micrel's breach of contract claim), but it is insufficient alone to establish the element of fraudulent misrepresentation on summary judgment. *Id*.

Micrel devotes much of its brief to detailing negotiations between TRW and National, which negotiations were occurring simultaneously with TRW's negotiations with Micrel, to show that TRW fraudulently induced Micrel to enter the 2001 Agreements.  *See, e.g., ECF No. 67*, at 4-6, 17-18.  According to Micrel, "[b]ased on TRW's representations to National, it is obvious that when TRW provided Micrel with its projections, it knew that those projections were not accurate.  Instead, the projections provided to Micrel were materially over-stated, because the ASICs were being eliminated."  *Id.*, at 18.  This argument lacks merit.  As shown above, TRW underestimated its ASICs requirements and, to date, next-generation ASICs have not eliminated current-generation ASICs from the marketplace.  It is also important to remember that prior to, and throughout, its relationship with Micrel, TRW had an ongoing relationship with National – the sole supplier of current-generation ASICs which had price control over its product.  It is thus of little moment that TRW continuously negotiated with, and sought price reductions from, National.

Finally, Micrel argues that TRW lied when it told Micrel that the introduction of next-generation ASICs would have no impact on TRW's volume estimates; specifically, by telling Micrel that the next-generation ASICs might never be qualified;  even if qualified they would be slowly introduced; some of TRW's smaller customers would not likely accept the new parts, or would do so far into the future, because accepting the new parts was an expensive proposition;  and some of the automobile companies had long-term warranty obligations and would therefore be reluctant to switch parts for 2003 models with 2002 parts under warranty.  *See ECF No. 67*, at 8.  This argument also lacks merit. It is undisputed that TRW informed Micrel during contract negotiations that the manufacture of next-generation ASICs by other suppliers would impact the projected estimates, albeit slowly.  Indeed, the

-19-

facts bore this prediction out.  Moreover, there is no evidence that any of the aforementioned statements allegedly made by TRW regarding its predictions about next-generation ASICs were not true.

### 2.    Failure to Disclose Material Facts

Micrel also claims that TRW concealed the following material facts:  the next-generation ASICs would replace many of the parts Micrel was developing;  in requesting quotes for next-generation ASICs, TRW used as projected quantities the same quantities it gave to Micrel;  TRW told National that the current-generation ASICs would only be continued through 2004 and 2005 at reduced levels;  TRW told National that the current-generation ASIC program would go away abruptly in mid-2003;  before the 2001 Agreements were signed TRW engineers alerted Mr. Muckley and Mr. Roberts that the estimates TRW had given Micrel were wrong because TRW intended to use the next generation ASICs on car platforms that were included in the Micrel projections and Mr. Muckley expressly told the engineers to say nothing to Micrel about the errors in the projections.  *ECF No. 67*, at 15.

"Fraudulent inducement may occur where there is a duty to disclose a fact material to the transaction, but that fact is concealed."  *Gouge*, 252 F.Supp.2d at 517 (citing *Yo-Can*, 149 Ohio App.3d at 525).  The duty can arise "when one party to a business transaction knows matters that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading."  *Id*. (quoting Restatement of the Law (Second), Torts, § 551(2)) (internal quotations omitted).  It has been held, in a federal securities case, that the law does not impose a duty to disclose information regarding current or future business plans that are uncertain and contingent in nature.  *Id.*

-20-

(citing *Warner Comm., Inc. v. Murdoch, et al.*, 581 F.Supp. 1482, 1491 (D. Del. 1984)).  This principle is grounded in the concern that it might be just as misleading to disclose contingent plans as it might be to fail to disclose such plans.  *Id*.

Micrel has failed to show that TRW's alleged concealment of its negotiations with National constitute fraudulent misrepresentations.  It is undisputed that TRW disclosed during contract negotiations with Micrel that it was negotiating with other suppliers for the purchase of next-generation ASICs, and the 2001 Supply Agreement expressly stated that TRW's obligation to purchase current-generation ASICs from Micrel could not be construed as a prohibition against TRW purchasing next-generation ASICs from another supplier.  *See 2001 Supply Agreement* ¶ 3(A).  Moreover, this lawsuit proves the point that the disclosure of uncertain and contingent future business plans can be just as misleading as the failure to disclose them, because at the time the parties entered the 2001 Agreements, it was uncertain whether or how quickly next-generation ASICs could be developed, and how they would be received by car manufacturers.  As it turned out, TRW's purchase of next-generation ASICs had negligible impact on TRW's requirement for current-generation ASICs in the years following the execution of the 2001 Supply Agreement.

The Court has also reviewed the Ronald Muckley August 10, 2001 e-mail in which Micrel claims that Muckley expressly told the engineers to say nothing to Micrel about the errors in the volume estimate projections.  *See ECF No. 63, Ex. 265*.  The Court finds this argument unavailing.  Muckley expressly used this e-mail to "cut short" discussion by TRW engineers of the impact of alternative business options on the volume estimates TRW was providing to Micrel, stating that TRW "will not under any circumstances deviate from [its] commitments" to Micrel.  *Id*.  Not only is Micrel's

interpretation of this e-mail questionable, it is irrelevant because the estimates TRW provided to Micrel understated the quantity of current-generation ASICs that TRW could have purchased from Micrel and eventually purchased from National at higher prices.

For all these reasons, Micrel has failed establish the first two elements of its fraudulent inducement claim, i.e., a false representation of a material fact or failure to disclose a fact material to the transaction, and knowledge of falsity of the representation or utter disregard for its truthfulness.

### 3.  Fraudulent Intent and Justifiable Reliance

Initially, Micrel makes the argument that issues involving intent or state of mind are not proper issues for resolution on summary judgment.  *See ECF No. 67*, at 25.  However, in *Street  v. J.C. Bradford and Co.*, the Sixth Circuit noted several principles intended to guide a "new area" of summary judgment practice, including the principle that summary judgment may be appropriate in claims where state of mind is at issue.  886 F.2d at 1479.  *See, e.g., Captiva, Inc. v. Viz Communications, Inc.*, 85 Fed. Appx. 501, 502, 507 (6th Cir. Jan. 8, 2004) (holding that a trial court's failure to enter summary judgment where plaintiff fails to offer sufficient evidence to support its allegation that promises were made without any intention to honor them would impermissibly "transform [a] breach of contract claim into a fraud claim");  *Burnside v. WashtenawMort. Co.*, No. C-1-01- 359, 2002 U.S. Dist. LEXIS 13325, at * 18 (S.D. Ohio, Jul. 15, 2002) (granting summary judgment on a claim of fraudulent inducement where plaintiff "offered no evidence as to [defendant's] intent to mislead Plaintiff into relying on the representation");  *Wall v. Firelands Radiology, Inc.*, 666 N.E.2d 235, 243 (Ohio Ct. App. 1995) (affirming summary judgment on claim of fraudulent inducement where plaintiff "has presented no evidence of any present intention not to perform when the representation was

made [and] no evidence of the speaker's present state of mind . . .") (internal quotations omitted).
With this in mind, the Court will address Micrel's arguments in turn.

Micrel argues that TRW's intentionally inflated volume estimates induced Micrel to enter the 2001 Agreements, and that Micrel justifiably relied on these numbers in deciding to release its claims.  There are three problems with this argument.  First, reliance on estimates is, as a matter of law, unjustifiable.  *Gouge*, 252 F.Supp.2d at 516 (citing *J.B. Colt Co. v. Wasson*, 15 Ohi App. 484, 487 (1922)).  Second, TRW under-estimated its ASICs requirements.  Third, given the unambiguous language of the 2001 Supply Agreement setting forth numerous conditions affecting the purchase of Micrel's ASICs and the integration clause which superseded any agreements or arrangements the parties had prior to October 10, 2001, the Court finds as a matter of law that Micrel's reliance on the volume estimates in executing the release was not justified.

Next, Micrel argues, "One of the things that TRW insisted upon was that in any deal the release had to be effective immediately, not after the purchase of some quantity of ASICs as Micrel initially proposed.  . . . This supports an inference that TRW made the various misrepresentations to induce Micrel to execute the Release and that TRW in fact had no intent to actually perform under the new 2001 Agreements."  *ECF No. 67*, at 25 (record citation omitted).  The Court disagrees.  Prior to October 10, 2001, the parties were negotiating a settlement of their claims and the terms of a new agreement defining their relationship going forward.  The fact that TRW insisted upon a release of previous claims before entering a new agreement with Micrel makes commercial sense and does not establish that TRW fraudulently induced Micrel to sign the 2001 Agreements.

-23-

Finally, Micrel contends that TRW's conduct after entering the 2001 Agreements establishes TRW's intent to enter contracts it had no intention of honoring. *See ECF No. 67*, at 25-26. As noted above, a defendant's repudiation of a contract is not evidence that it had a preconceived plan to defraud the plaintiff. *Schneider*, 1998 WL 76524, at *7; *see also Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1186 (3rd Cir. 1993) ("The mere proof of nonperformance does not prove a lack of intent to perform."). The Court finds that Micrel's examples of TRW's post-October 2001 conduct which purportedly shows pre-October 2001 Agreement fraudulent intent constitute nothing more than speculation.[4]

In sum, Micrel has failed to provide sufficient evidence to survive summary judgment on its fraudulent inducement claim based on TRW's volume estimates (which in fact underestimated its requirements), TRW's predictions about next-generation ASICs, or TRW's negotiations with National. Rather, the evidence shows that both parties had legitimate incentives to enter the 2001 Agreements: Micrel believed that it was close to completing the ASICs project it began in 1998 and that entering the 2001Agreements was a sound business decision. TRW was looking to cull another supplier of current-generation ASICs to reduce its component costs, and wanted the specter of a lawsuit off its books since it was an acquisition candidate. What happened after the parties executed the 2001 Agreements is, however, another matter.

---

[4]For example, TRW's unwillingness to grant Micrel another extension of the development schedule connotes little in light of the fact that it had no contractual obligation to agree to such a modification. *See 2001 Development Agreement* ¶ 16. In fact, TRW's previous acquiescence to a schedule extension disproves Micrel's position.

Because Micrel has failed to establish its fraudulent inducement claim, Claim One is

**DISMISSED WITH PREJUDICE**.

**B.**      **Claims Four, Six, Eight  –  Pre-Release Conduct**

In a previous Memorandum of Opinion and Order, the Court noted that these three

claims would only arise "if Micrel successfully proves that the Release and the 2001 Agreement[s] were

procured by fraud." *ECF No. 38*, at 16.  The Court's ruling dismissing the fraudulent inducement claim

necessarily means that the Release applies to bar any claims based on conduct occurring prior to its

execution date, or October 10, 2001.  Accordingly, Claims Four (breach of the the 1998 Agreement),

Six (breach of oral contract), and Eight (estoppel) are also **DISMISSED WITH PREJUDICE**.

**C.**      **Claims Five and Seven  –  Quantum Meruit and Unjust Enrichment**

TRW contends that the Fifth and Seventh claims which sound in quasi-contract should

be dismissed as a matter of law.  TRW previously sought judgment in its favor on these claims to the

extent that they related to the 1998 Agreement or pre-Release matters.  *See ECF No. 19*, at 22.  The

Court granted this request, stating, "In Ohio, '[a] party seeking a remedy under a contract cannot also

seek equitable relief for unjust enrichment or quantum meruit, because the terms of the agreement define

the parties' relationship in the absence of fraud, bad faith or illegality.'"  *ECF No. 38*, at 16 (quoting

*Wolfer Enter. v. Overbrook Dev. Corp.*, 132 Ohio App.3d 353, 357 (1999), and *Kilbury v.*

*Bennett*, 1999 WL 436742, at *6 (Ohio App. 1999) ("a party seeking remedy under a contract

cannot seek equitable relief for unjust enrichment . . . [since] compensation is governed by the parties'

contract")).  The Court then permitted the parties to conduct discovery on the remaining claims.

-25-

Micrel now acknowledges that, "until the court resolves the fraud claim, it is inappropriate to grant summary judgment on the claims for quantum meruit and unjust enrichment." *ECF No. 68*, at 27.  Because the Court has ruled that, following discovery, Micrel failed to establish that TRW fraudulently induced Micrel to enter the 2001 Agreements, the Court finds that the parties are bound by the terms of those express agreements.  Thus, the quasi-contractual remedies of quantum meruit and unjust enrichment are not available to Micrel.  *See Pawlus v. Bartrug*, 109 Ohio App.3d 796, 800 (1996) (regarding quantum meruit); *University Hosp. of Cleveland, Inc. v. Lynch*, 96 Ohio St.3d 118, 130 (2002) (regarding unjust enrichment).  Accordingly, the Court **GRANTS** summary judgment in favor of TRW on Claims Five and Seven.

### D.      Claim Nine – Breach of the 2001 Agreements

Both parties have brought claims against each other for breach of the 2001 Agreement.  However, only TRW has filed a dispositive motion on this claim.  In order to prevail on a breach of contract claim under Ohio law, Micrel needs to establish the following elements:  (1) the existence of a contract, (2) breach by the defendant, (3) performance by the plaintiff, and (4) damage or loss to the plaintiff.  *Resource Title Agency v. Morreale Real Estate Servs., Inc.*, 314 F.Supp.2d 763, 769 (N.D. Ohio 2004) (citing *Thomas v. Publishers Clearing House, Inc.*, 29 Fed. Appx. 319 (6th Cir. Feb. 5, 2002) and *Doner v. Snapp*, 98 Ohio App.3d 597 (Ohio Ct. App. 1994)).

Generally, TRW contends that Micrel breached the 2001 Development Agreement by repeatedly failing to meet initial and subsequently modified schedule deadlines.  Micrel counters that TRW breached the 2001 Development Agreement by failing to promptly test the components Micrel delivered to it (which, Micrel claims, did not have to be fully qualified for TRW to test), by failing to

-26-

promptly notify Micrel of the new 25kV ESD testing requirement, and by violating the termination provisions of the 2001 Development Agreement.

The Court has reviewed the evidence filed in support of, and in opposition to, TRW's motion and concludes that there are genuine factual issues regarding whether either party performed or failed to perform its obligations under the 2001 Development Agreement, whether either party breached the Agreement, and whether either party suffered a loss as a result.  Accordingly, summary judgment is **DENIED** as to Micrel's ninth claim (breach of the 2001 Agreements).

## IV.    CONCLUSION

Based on the foregoing, Defendant TRW Automotive US LLC's Renewed Motion for Summary Judgment on all Claims Relating to the 1998 Agreement or Pre-October 2001 Claims (**ECF No. 60**) is hereby **GRANTED**.  Thus, Micrel's Claims One, Six and Eight are **DISMISSED WITH PREJUDICE**.

TRW Automotive US LLC's Second Motion for Summary Judgment, Seeking Dismissal of the Fifth, Seventh, and Ninth Claims in Micrel's Complaint (**ECF No. 61**) is **GRANTED** in part and **DENIED** in part.  Summary judgment is granted in TRW's favor with respect to Micrel's Claims Five and Seven, which are hereby **DISMISSED WITH PREJUDICE**.  Summary judgment is **DENIED** with respect to Micrel's Claim Nine, which shall proceed to trial.

The Court previously issued a trial order scheduling a trial in this case on July 12, 2005. *ECF No. 85*.  Because of the Court's rulings, only Micrel's claim for breach of the 2001 Agreements and TRW's counterclaims will be tried at that time.

**IT IS SO ORDERED.**


*/s/ Dan Aaron Polster    May 17, 2005*
**Dan Aaron Polster**
**United States District Judge**