**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MICREL, INC.,** | ) | **Case No.  1:02 CV 2539** |
| | ) | |
| **Plaintiff / Counterclaim** | ) | |
| **Defendant,** | ) | **Judge Dan Aaron Polster** |
| | ) | |
| **vs.** | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| **TRW, INC., dba TRW AUTOMOTIVE,** | ) | **AND ORDER** |
| **ELEC. GROUP,** | ) | |
| | ) | |
| **Defendant / Counterclaim** | ) | |
| **Plaintiff.** | ) | |

This matter is before the Court on Plaintiff Micrel, Inc.'s Motion for New Trial

("Motion") (**ECF No. 167**).  Micrel argues that the jury verdict against Micrel and in favor of

Defendant TRW, Inc. was against the weight of the evidence, the Court's instructions were

improper and the interrogatories were insufficiently specific, and the damages award was

irreconcilable with the evidence offered at trial.  This Motion is **DENIED** for the reasons set

forth in Section II  below.

Also before the Court is Bill of Costs (**ECF No. 181**) filed by TRW as the prevailing

party in this matter.  TRW seeks a total amount of $113,325.19 from Micrel.  Micrel has filed its

objections, *ECF No. 182*, and TRW has filed a reply, *ECF No. 183*.  For the reasons set forth in

Section III below, the Court concludes that TRW's costs are taxable to Micrel in the amount of

**$85,516.40**.

# I.

This case revolves around a series of contracts which TRW and Micrel executed in January 1998 and October 2001.  The first contract ("the 1998 Agreement") provided that Micrel would design for TRW three application-specific integrated circuits ("ASICs") to use as components in air bag control modules that TRW manufactured and sold to various car manufacturers.  The three ASICS are called the "dual squib," the "quad squib" and the "power supply."  TRW terminated the 1998 Agreement after numerous delays in the development of the ASICs, and Micrel threatened to sue TRW for wrongful termination.  The parties conducted settlement negotiations over the next year and a half, and ultimately resolved their dispute by executing three new contracts on October 10, 2001, which will be referenced as the 2001 Development Agreement, the 2001 Supply Agreement, and a mutual release of claims arising from the parties' pre-October 2001 conduct.  The 2001 Development and Supply Agreements allowed Micrel to resume development of the ASICs, in accordance with a development schedule prepared by Micrel.  *Trial Transcript ("Tr.")* at 1172-73.  The schedule contemplated a production release date of June 2002.  If successfully accomplished, the agreements required TRW to purchase Micrel's ASICs in production quantities.

Within a few months of signing the 2001 agreements, the relationship between the parties soured yet again.  The development schedule suffered delays.  According to Micrel, the delays were caused by TRW's imposition of a new ("25kV") testing requirement not specified in the contract, and by TRW's failure to promptly test the parts which Micrel sent to it.  According to TRW, Micrel was well aware of the 25kV testing requirement, and simply was unable to provide

parts for testing that complied with either Micrel's or TRW's testing requirements. The relationship irretrievably broke down in the summer of 2002.

On December 27, 2002, Micrel filed the instant case. The complaint alleged the following claims targeting TRW's pre- and post-October 2001 conduct: (1) fraud in the inducement of the release; (2) rescission for failure of consideration; (3) rescission due to mutual mistake; (4) breach of the 1998 Agreement; (5) quantum meruit; (6) breach of oral contract; (7) unjust enrichment; (8) estoppel; and (9) breach of the 2001 Agreements. TRW thereafter filed the following counterclaims against Micrel: (1) breach of the 2001 Agreements; (2) breach of the release; (3) breach of express warranties; (4) breach of implied warranty of merchantability; (5) breach of implied warranty of fitness for purpose; and (6) a request for declaratory judgment.

Prior to trial, the Court dismissed with prejudice, upon dispositive motions filed by TRW, all but the last count of Micrel's complaint, i.e., the claim for breach of the 2001 Agreements (Count 9). *See ECF Nos. 38, 86*. In addition, the Court ruled that TRW had no claims for breach of express or implied warranties independent from its breach of contract claim (Count I). *See July 7, 2005 FPT Hr'g Tr*., at 47-48. Accordingly, the case proceeded to trial on the parties' breach of contract claims.

The trial, which began on July 12, 2005, lasted two weeks. The case went to the jury on July 22, 2005, and the jury returned a verdict in TRW's favor in the amount of $9,282,188. *ECF No. 155*. The matter is before the Court on Micrel's post-trial motion and TRW's bill of costs.

## II.

Pursuant to Rule 59, Micrel asks that the judgment in favor of TRW be vacated and that Micrel be granted a new trial. Micrel contends that the jury's verdict was against the weight of

the evidence, the Court's instructions were improper and its interrogatories were insufficiently specific, and the damages award was irreconcilable with the evidence offered at trial.

Federal Rule of Civil Procedure 59(a) provides, in pertinent part:

A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States; . . ..

Fed.R.Civ.P. 59(a).  The Sixth Circuit has held that a new trial is warranted under Rule 59(a) when a jury has reached a seriously erroneous result as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party.  *See Holmes v. Massillon*, 78 F.3d 1041, 1045-6 (6th Cir. 1996) (citations omitted).

### A.    Weight of the Evidence

When ruling on a motion for new trial based upon the ground that the verdict is against the weight of the evidence, the district court may set aside the verdict "only if it determines that the verdict is against the clear weight of the evidence."  *United States v. L.E. Cooke Co., Inc.*, 991 F.2d 336, 343 (6th Cir. 1993) (citing *Woodbridge v. Dahlberg*, 954 F.2d 1231, 1234 (6th Cir.1992)).  The moving party must show that the verdict is unreasonable.  *Barnes v. Owens-Corning Fiberglass Corp.*, 201 F.3d 815, 820-21 (6th Cir. 2000) (citing *Holmes*, 78 F.3d at 1047)).  A verdict is not unreasonable simply because different inferences and conclusions could have been drawn or because a judge feels that other results are more reasonable.  *Id.*, 201 F.3d at 821(citation omitted); *L.E. Cooke Co.*, 991 F.2d at 343 (citation omitted).  "Thus, if a reasonable juror could reach the challenged verdict, a new trial is improper."  *Barnes*, 201 F.3d at 821 (citing *Holmes*, 78 F.3d at 1048).

-4-

Micrel's weight-of-the-evidence argument does not even present a close call. Overwhelming evidence at trial established that it was Micrel, not TRW, which breached the 2001 Agreements.  The Court need not address every argument Micrel raises on this issue because TRW has adequately pointed to documentary and testimonial evidence disproving each of them.  *See ECF No. 178,* at 1-5.  The Court would, however, like to highlight one point.

Evidence presented at trial showed that TRW sent three letters to Micrel expressing its concern over Micrel's proposed schedule extensions and placing the blame for those delays squarely on the shoulders of Micrel – all of which went unanswered.  Internal Micrel e-mails discussing TRW's letters contain admissions that TRW's position was correct.  Micrel's technical project manager and its key witness, Doug Miller, testified at trial that he read each of the TRW letters and wrote each of the follow-up e-mails – all of which are recounted below.

On March 13, 2002, Phil Roberts, TRW's Director of Purchasing, sent a letter to Steve Carter, Micrel's Area Sales Manager, stating in pertinent part:

> I am writing this letter to express TRW's concern about the current status of the development program with Micrel on ASICs PN's 151442, 151443 and 151444.[1] As I indicated to you in our meeting on February 8th in Farmington Hills, we are missing specific program application opportunities for Micrel product <u>due to Micrel's delays in delivering product to TRW that will pass component and subsequent module qualification</u>.  To date the following (MY) Model Year 2003 program application PV (Product Validation) testing opportunities have been missed <u>due to Micrel delays in delivering product that meets specifications</u>.

*Tr.* at 1183-84, *Ex. 226* (emphasis added).  After listing the missed sales opportunities for Micrel, Roberts provided a laundry list of qualification problems with each of the ASICs, asserted his understanding that, based upon these outstanding issues, TRW should expect to see

---

[1]The dual ASIC is part number ("PN") 151442, the quad ASIC is PN 151443 and the power supply is part number 151444.

samples of the next revisions "in approximately 5 weeks," and asked Carter to contact him if he disagreed with the above.  *Id*.  Micrel never formally responded to this letter.  However, on March 14, 2002, Micrel's Doug Miller reviewed a copy of the letter, after which he sent an e-mail to his boss, Scott Ward, acknowledging that Roberts' letter was "mostly accurate, with the exception that [the quad ASIC] will not be available in 5 weeks."  *Tr.* at 1185, *Ex. 447*.

On March 26, 2002, Doug Miller sent an e-mail to TRW with a proposed extended development schedule with new production release dates in September (dual squib), October (quad squib), and November 2002 (power supply).  *Tr.* at 1185-86, *Exs. 706, 829*.

On April 11, 2002, TRW's Phil Roberts sent a second letter to Micrel's Steve Carter responding to Miller's proposed schedule, which provided in pertinent part:

> We are extremely concerned about the latest development delays contained in Micrel's revised proposed schedule.  Reluctantly, TRW feels that it has little choice but to accept the proposed schedule submitted by Micrel unless Micrel can present an alternative solution to expedite the delivery of product.
>
> <u>Due to Micrel's failure to deliver product to specification on the schedule originally set forth in Exhibit 1 of the ASIC Development Agreement,</u>  the potential volumes for Micrel product will be significantly lower than the estimated volumes at the time the parties entered into the Development and Supply Agreements.

*Tr.* at 1186-88, *Ex. 229* (emphasis added).  Roberts noted that, based on Micrel's latest proposed schedule, there did not appear to be any opportunity for production volume in calendar year 2002 and the delays were "beginning to adversely impact the potential volume for calendar year 2003 as well."  *Id*.  Roberts stated that TRW would not be inclined to accept any further delays in Micrel's latest proposed schedule, and asked Carter to contact him if he would like to discuss this matter further.  *Id*.  Again, TRW received no formal response to this letter.

On May 14, 2002, Micrel's Doug Miller sent another proposed revised schedule to TRW

with new production release dates in January and February of 2003.  *Tr.* at 1190, *Ex. 452*.

On May 29, 2002, TRW's Phil Roberts sent a third letter to Micrel's Steve Carter

responding to the latest proposed schedule stating, in pertinent part:

> In my letter of April 11, 2002, I had stated that TRW would not be inclined to
> accept any further development delays.  Reluctantly, TRW feels that it must reject
> the latest proposed schedule delays and exercise termination for cause as defined
> in Paragraph 8 of the ASIC Development Agreement No. TA-4866.  TRW
> considers Micrel to be in breach of its contract with TRW <u>because of Micrel's
> failure to meet the already extended delivery schedule and certain contractually
> agreed upon specifications</u>.

*Tr.* at 1192-93, *Ex. 231* (emphasis added).  Roberts stated that, under the Development

Agreement, Micrel was entitled to a mutually agreed upon period of no more than three months

in which to correct its deficiencies, and TRW would accept Micrel's latest proposed schedule as

that mutually agreed upon time.  *Id.*  If, however, Micrel were unable to meet those dates or any

of the contract requirements, TRW would consider the termination effective immediately.

Again, Roberts solicited a response from Carter, and again, Micrel failed to respond.

On May 30, 2002, however, Micrel's Doug Miller sent an internal e-mail to his boss,

Scott Ward, containing his assessment of the TRW ASICs project wherein he discussed

numerous qualification problems with each of the ASICs;  the cost to Micrel of going forward

with the project;  and various problems with Micrel's original business assessment of the project.

*Tr.* at 1194-99, *Ex. 454*.  He summarized:

> This program still has a large amount of risk going forward and there is a
> reasonable chance the schedule will slip again.  As stated by TRW, any further
> delay will cause the Agreement to be terminated.  This actually makes sense since
> production is only forecasted to run through 2004.
>
> Also, Micrel will be taking on a large amount of potential liability once these

devices are sold as production.  These are safety critical components and are subject to recalls and lawsuits if they ever have a problem.  Micrel will have to sustain a large liability insurance premium (approx $500k/yr) for several years after the last unit ships.  So, 1.5 yrs of production may have to cover over $4M of insurance premiums (please note, the actual insurance premium may be less or more based on changing volumes and business climates).

And finally, TRW has never given a firm commitment to buy any Micrel product once qualified.  The sole decision whether to purchase Micrel product as a module cost savings is in the hands of TRW's customers.  If TRW's customers determine that the cost savings do not justify the added risk of a new vendor with only 1.5 years of production left, then Micrel will not see any volumes (even with fully qualified final Si[licon]).

*Id.*

In sum, the Court finds based on this evidence <u>alone</u> that a reasonable juror could reasonably conclude that Micrel was responsible for breaching the 2001 Agreements by failing to develop fully qualified ASICs in a timely manner.  Indeed, Micrel's Doug Miller admitted as much at trial.  Specifically, when asked on cross examination whether Micrel complied with paragraph 11 of the 2001 Development Agreement, wherein Micrel warrants that the ASICs delivered during the development process would meet all applicable quality requirements of Micrel and TRW, Miller replied, "No."  *Tr.* 1242-43.  On re-cross examination, he testified as follows:

Q.      One, at the end of the day the dual was not meeting the component level requirement?

A.      That's correct.

Q.      Two, at the end of the day the power supply was not meeting the component level requirement?

A.      That's correct.

Q.      Three, sir, the quad, at the end of the day, the quad was not meeting Micrel's internal design rules?

-8-

A.      I'm not able to comment on that.

Q.      And the quad at the end of the day was not meeting TRW's customers requirements?

A.      The quad at the end of the day [George] Backos was indicating had module issues.

Q.      Nothing further, thank you, sir.

*Tr.* at 1255-56.

Accordingly, the Court finds that there was sufficient evidence from which a reasonable juror could conclude that Micrel breached the 2001 Agreements.

### B.    Jury Instructions and Interrogatories

A trial court has broad discretion in drafting jury instructions, and will not be reversed unless the jury charge as a whole "fails to accurately reflect the law." *United States v. Beaty*, 245 F.3d 617, 621 (6th Cir. 2001).  "A jury instruction which states with substantial accuracy and fairly submits the issues to the jury will not provide grounds for reversal." *Clarksville-Montgomery County School Sys. v. United States Gypsum Co.*, 925 F.2d 993, 1003 (6th Cir. 1991).  There are no grounds for a new trial where "the instructions as a whole are not misleading and leave the reader with a sense of what the Court was asking." *Iron Workers Local Union No. 17 v. Philip Morris, Inc.*, 186 F.R.D. 453, 457 (N.D. Ohio 1999).

First, Micrel argues that "[i]t was legally improper for the Court [to] instruct the jury such that they had <u>no choice</u> but to read the 2001 Development Agreement and the 2001 Supply Agreement together." *ECF No. 168*, at 13 (emphasis added).  However, Micrel mischaracterized the jury instruction.  *Id.*, at 12 (emphasis added).  The actual instruction read to the jury provides:

> Some agreements may be encompassed in more than one written document.  Separate agreements or documents that are related or part of the same transaction <u>may</u> be read together.

*Tr.* at 1502 (emphasis added).  This instruction did not require the jury to read the 2001 Development and Supply Agreements together, but simply permitted the jury to do so if they concluded the documents were related.  In fact, it is a correct statement of the law.  *See Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Auth.*, 78 Ohio St.3d 353, 361 (1997) ("a writing or writings executed as part of the same transaction will be read as a whole, and the intent of each part will be gathered from a consideration of the whole."); *Mantua Mfg. Co. v. Commerce Exchange Bank*, 75 Ohio St.3d 1, 5 (1996) ("Multiple documents should be construed together if they are part of the same transaction."); *Prudential Ins. Co. of Am. v. Corp. Circle, Ltd.*, 103 Ohio App.3d 93, 98 (Ohio App. 1995) ("Thus, all writings that are part of the same transaction should be interpreted together, and effect should be given to every provision of every writing.").

Furthermore, the evidence at trial supported a conclusion that the Agreements were interrelated and should be read together.  Micrel's President, Ray Zinn, testified that the agreements were interrelated with a single goal:

> Q.    And the supply and development agreements were interrelated.  They talked about each.  Are you aware of that?
>
> A.    There was a relationship, yes.
>
> Q.    And the overall goal of the 2001 agreements was to sell millions of parts to TRW, correct?
>
> A.    I don't recall the quantities.
>
> Q.    But, it was to sell production quantities for TRW, correct?

A.      Correct.

*Tr.* at 222.  TRW's Product Development Manager George Backos, testified likewise:

Q.      And in terms of these agreements that were signed in 2001, the 2001 development agreement, the 2001 supply agreement, now, what was the purpose of those agreements?

A.      The purpose of those agreements were for Micrel to produce us with production quantity parts meeting specifications.

Q.      That was the predominant purpose of those agreements?

A.      Yes.

Q.      Was the development works of Micrel of any value to TRW without working parts that TRW could then sell to its customers?

                    *        *        *

A.      No, the development work would be of no value to us, we couldn't use the part.

Q.      In fact, the jury has heard something about the work that was done by Micrel in trying to develop these parts.
            Did TRW use that work for any purpose once these agreements were done?

A.      No, we did not.

*Tr.* at 873-74.[2]

Thus, the instruction is a correct statement of the law, and the evidence supports the

conclusion that the Agreements should be read together.

_____

[2]Additionally, the 2001 Agreements themselves are expressly interrelated.  They were executed at the same time by the same parties, and the commencement date of both Agreements is October 10, 2001, and the parties agreed that termination for cause of one Agreement "shall likewise be deemed" termination for cause of the other Agreement.  The cost of developing the ASICs cannot be determined by review the 2001 Development Agreement alone because the price structure is contained in both Agreements.  Finally, the overall goal of the Agreements was for Micrel to develop ASICs which TRW can purchase in production quantities. *See 2001 Development Agreement,* Overview at 1; *2001 Supply Agreement,* Overview at 1, Tr. at 222.

*      *      *

Next, Micrel argues that the Court's instruction labeled "Micrel's Breach of Contract Claim: Essential Elements" was also in error because it excluded numerous grounds upon which Micrel claimed that TRW breached each of the 2001 Agreements.  The instruction at issue read:

> Before you can find for Micrel on its breach of contract claim, you must find that Micrel proved by the greater weight of the evidence each of the following four elements:
>
> (1)   The parties entered into the October 10, 2001 Development and Supply Agreements or contracts;
>
> (2)   TRW breached the Agreements in <u>one or more of the following ways</u>:  by requiring Micrel to meet requirements that were not provided for in the Agreements; by failing to promptly test the sample ASICs that Micrel provided to TRW and by failing to promptly report test results to Micrel; by not using commercially reasonable efforts to have TRW's customers approve use of Micrel's ASICs  in TRW's modules; by refusing to grant Micrel a commercially reasonable schedule extension; by reducing its ASICs volume estimates in bad faith; and by failing to timely perform <u>other obligations TRW had under the contracts</u>;
>
> (3)   Micrel was not in material breach of the Agreements at the time of TRW's breach; and
>
> (4)   TRW's breach caused Micrel to suffer damages.

*Tr*. at 1502-03 (emphasis added).  This argument lacks merit for the following reasons.

Micrel agreed to this exact instruction for purposes of the preliminary jury charge, while reserving the right to challenge this as a final instruction.  *Tr*. at 1071.

The second element of this charge sets forth examples of the types of conduct on the part of TRW which Micrel considers a breach.  The examples are not exclusive ("in one or more of the following ways") and contain a catch-all provision permitting the jury to find that TRW breached the agreements if Micrel can show that TRW failed to perform "other obligations TRW

-12-

had under the contracts."  There is absolutely nothing in this instruction that precluded Micrel

from offering any evidence, or making any argument, at trial.  In fact, the Court's instruction

includes every form of conduct Micrel sets forth in its proposed instructions, with the exception

of language that is repetitive or argumentative.[3]

*          *          *

Micrel argues that the Court's "condition precedent" instruction was in error because it

did not adequately explain the applicability of the concept, and because the Court did not explain

---

[3]With respect to the second element of its claim for breach of the 2001 Development
Agreement, Micrel proposed:

> (B)     TRW breached the 2001 Development Agreement, including, in one or
>         more of the following ways:
>     (i)      by requiring Micrel to meet requirements that were not set forth in the
>              2001 Development Agreement,
>     (ii)     by refusing to agree to a modification of TRW's module;
>     (iii)    by failing to promptly test the sample ASICs that Micrel provided to TRW
>              and by failing to promptly report the test results to Micrel;
>     (iv)     by refusing to grant Micrel a commercially reasonable schedule extension;
>     (v)      by hindering or preventing Micrel's performance.

*ECF no. 113, Plaintiff's Proposed Jury Instruction No. 1.*  With respect to the second element of its
claim for breach of the 2001 Supply Agreement, Micrel proposed:

> (B)     TRW breached the 2001 Supply Agreement in one or more of the
>         following ways:
>     (i)      by providing Micrel with an estimated number of ASICs it would
>              need before Micrel agreed to enter into the 2001 Development
>              Agreement and 2001 Supply Agreement, and later drastically
>              reducing the estimated number of ASICs that it required in the
>              absence of good faith. A buyer's actual requirements may change
>              upward or downward from the estimate but any such change must
>              be in good faith.  Good faith in this context means honesty in fact
>              and the observance of reasonable commercial standards of fair
>              dealing in the trade with the focus on whether the reduction
>              stemmed from a legitimate business reason.  The buyer cannot
>              simply reduce its quantities because it is having secont thoughts
>              and wants out of the contract.

*Id., Plaintiff's Proposed Jury Instruction No. 2.*

-13-

that, before the jury could find for TRW, it had to find that all conditions precedent to Micrel's duty to perform were satisfied.

Although Micrel mentioned the term "condition precedent" in its Proposed Jury Instruction No. 5.  However, Micrel provided no additional instruction for defining the term, Consequently, the Court provided a definition to which the parties initially agreed, *Tr*. at 1078-79, and the definition is a correct statement of the law.[4]  *See, e.g., Board of Comm'rs of Hamilton County v. Arena Mgt. Holdings, LLC*, No. C-030312, C-030339, 2004 WL 102137 at \*3 (Ohio App. 1 Dist. Jan. 32, 2004) (citations omitted)*; Polster v. Park View Fed. Sav. & Loan Ass'n*, No. 49103, No. 1985 WL 6890 (Ohio App.. 8 Dist. Jun. 27, 1985) (citing *Mumaw v. Insurance Co*., 97 Ohio St. 2 (1917), *in turn citing* Restatement (Second) of Contracts § 224 (1981)).

In addition, Micrel can show no prejudice.  Although Micrel argues that it could not make the argument that it had no duty to deliver parts to TRW because conditions precedent were not satisfied, the Court's definition specifically advised the jury that all conditions had to be satisfied "before performance under a contract became due." *Tr*. at 1503-04, 1506.  Further, the jury was instructed that TRW could not recover on its breach of contract claim if Micrel could show that TRW was "in material breach of the Agreements at the time of Micrel's

---

[4]The Court's instruction provided:

> As part of a contract, parties may agree to a condition, which is to occur before performance under a contract becomes due.  This is called a "condition precedent."  However, no party can insist upon a condition precedent when the non-performance of the condition has been caused by that party.  Where a party's conduct prevents the occurrence of a condition, that party cannot avail itself of that conduct to avoid liability to the other party to the contract.  One cannot avoid liability by preventing the performance of a condition precedent.

*Tr*. at 1503-04, 1506.

-14-

breach[.]" *Tr.* at 1505.  Again, Micrel was free to make any argument it wanted based on these instructions.

Micrel also challenges the Court's "good faith" instruction.  The Court instructed the jury that "good faith" means "honesty in fact in the conduct or transaction." *Tr.* at 1503, 1506. Micrel agreed to this instruction prior to trial, *Tr.* at 1076-77, and it is a correct statement of the law. *See, e.g., Roger Edwards, LLC v. Fiddes & Sons, Ltd.*, 387 F.3d 90 (1st Cir. 2004) (citing Restatement (Second of Contracts § 205, cmt. a); *Rohner, Gehrig & Co. v. Capital City Bank*, 655 F.2d 571 (5th Cir. 1981).  Thus, there is no error.

*     *     *

Next, Micrel argues that the Court erred by failing to instruct the jury that TRW could be found liable for breach of contract based on TRW's pre-October 10, 2001 conduct.  This claim is baseless.

Although the parties in this case signed a mutual release of claims arising from their pre-October 2001 conduct, Micrel alleged numerous claims against TRW based upon its pre-October 2001 conduct.  Prior to trial, the Court dismissed with prejudice each of those claims. *See ECF Nos. 38, 86.*  After the conclusion of discovery, the Court granted summary judgment on Micrel's claim that TRW fraudulently induced Micrel to release its claims under the 1998 Agreement and enter the 2001 Agreements. *ECF No. 86.*  Among other things, the Court addressed and rejected Micrel's arguments that TRW overstated its projected production estimates for the years 2002 to 2004 to induce Micrel to release its claims, *id*. at 13-17; that TRW lied about there being no "windows" Micrel needed to meet in its development schedule to induce Micrel to release its claims, *id*. at 17-18; that TRW lied when it told Micrel that TRW's

-15-

estimates would not drop off a cliff by the introduction of next-generation ASICs in order to get Micrel to release its claims, *id*. at 19-20, – arguments which Micrel is trying to resurrect in its new-trial motion.  Despite this comprehensive legal ruling and over strenuous objection by TRW, the Court was in fact liberal in allowing Micrel to present evidence of TRW's pre-October 2001 conduct for the sole purpose of establishing that TRW breached the 2001 Agreements.[5]  Most importantly, Micrel agreed to an instruction specifically limiting this evidence.  *June 30, 2005 FPT Hr'g Tr.*, at 40-41, 58.

*     *     *

Micrel claims that the Court's interrogatories oversimplified the issues and were confusing.  This is an insufficient basis upon which to grant a new trial.

"Whether a court uses a special or general verdict rests in its discretion, as does the content and form of any interrogatories it chooses to submit."  *Bills v. Aseltine*, 52 F.3d 596, 605 (6th Cir. 1995).  *See also Drelling v. General Elec. Co.*, 511 F.2d 768, 774 (5th Cir. 1975) ("both the initial question of whether to employ special interrogatories and the second question of how those interrogatories are to be framed are matters within the sound judicial discretion of the trial judge.").  Fed. R. Civ. P. 49(b) makes clear that a new trial will not be granted because of an error in the jury interrogatories unless "the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict[.]"  On the other hand, where "the general verdict and the answers are harmonious, the appropriate judgment upon the verdict and answers shall be entered pursuant to Rule 58."  Fed. R. Civ. P. 49(b).

---

[5]One reviewing the trial transcript could almost say that, despite the Court's legal ruling and its limiting instruction, Micrel tried its fraudulent inducement claim to the jury and lost.

The answers to the interrogatories are consistent with each other and are likewise consistent with the general verdict.  *ECF Nos. 158-160*.  Accordingly, this claim has no merit.[6]

\*       \*       \*

Next, Micrel argues that the Court improperly instructed the jury on the measure of damages because it failed to adequately explain the applicability of cover damages.  According to Micrel, "the instruction failed to give the jury an opportunity to consider the argument that TRW terminated the Agreements before Micrel was required to deliver ASICs to TRW under either the Development Agreement or the Supply Agreement."  *ECF No. 168*, at 19.  There are several problems with this argument.

First, the jury instruction on TRW's damages was not limited to cover damages.  *Tr* at. 1509-1511.  The Court instructed the jury on the expectation measure of damages generally applicable to breach of contract claims, along with incidental damages, consequential damages and nominal damages – to which Micrel never objected.

Second, although Micrel did not want the Court to instruct the jury on cover damages, it insisted that the Court instruct the jury on Micrel's lost profits – which would have required the jury to conclude that TRW breached <u>both</u> contracts.  The instruction provided:

> Micrel claims that it is <u>entitled to win damages for lost profits</u>.  In order to award the lost profits claimed by Micrel, you must find that the profits were within the contemplation of the parties at the time the contracts were made and that the loss of profits was the probable result of TRW's breach.
>
> Lost profits are calculated by deciding what Micrel would have received had the <u>contracts</u> been performed.  You should then add other damages, if any, suffered by Micrel as a result of TRW's breach.  From this sum, you should

---

[6]The Court notes that it made every effort to streamline this case and make it understandable to the jury.  The trial involved only two contract claims.  The Court asked counsel to file agreed-upon interrogatories.  Micrel responded by filing <u>sixty-six</u> proposed interrogatories that were utterly confusing.  *See ECF No. 114.*

subtract any amount that Micrel saved by not having to fully perform the
Agreements.

*Tr*. at 1508 (emphasis added).  In the end, it makes no difference whether the jury awarded TRW

damages under the common law or the UCC because under either measure, TRW's damages are

the same and supported by the evidence.  *See infra*, at 18-19.

Finally, Micrel's contention that the 2001 Development Agreement should be read in

isolation was not supported by the evidence at trial.  As previously noted, Micrel President Ray

Zinn and TRW Product Development Manager George Backos both testified that the overall goal

of the 2001 Development and Supply Agreements was to sell production quantities of ASICs.

*See supra*, at 10-11.  Thus, any alleged error would be harmless.

\*       \*       \*

According to Micrel, the jury's damage award shows how confused the jury was by the

instructions.  A jury's award of damages will not be overturned "if the verdict is within the range

of proof and the jury was properly instructed."  *American Anodco, Inc. v. Reynolds Metal Co.*,

743 F.2d 417, 425 (6th Cir. 1984).  An award of damages must stand unless it is  (1) beyond the

range supportable by proof, (2) so excessive as to shock the conscience, or (3) the result of a

mistake.  *Bickel v. Korean Air Lines Co.*, 96 F.3d 151, 156 (6th Cir.1996).

TRW's damages presentation at trial was orderly and reflected the evidence.[7]  *See*

*generally Tr*. at 1371-1389, *Exs. 827, 836*.  TRW provided a summary at trial calculating its

damages at $9,661,475.  *Id.*  This amount took into account the numbers in the 2001

_____

[7]Unlike Micrel, TRW did not attempt to seek damages based on the production release date
established by Micrel in the 2001 Development Agreement (June 2002) because Micrel sought, and
TRW approved, one schedule extension with new production release dates in the fall of 2002.
Therefore, TRW's damages calculation more accurately represented the evidence than Micrel's
did.

Development and Supply Agreements, the agreed-upon extended production release dates, the difference between what TRW would have paid Micrel and what it in fact paid TRW paid National Semiconductor for the same ASICs between the end of 2002 and through 2004, interest, net present value deduction, etc.  *Id*.  TRW's Phil Roberts provided testimony explaining TRW's damages calculation.  *Id.*  The Court finds that the jury's damages award of $9,282,188 is a reasonable number within the range of proof presented by the parties; that the award does not shock the conscience; and it is not the result of mistake.

### C.

Because Micrel has failed to show that the jury's verdict is against the weight of the evidence, or that the Court's instructions were incorrect or prejudicial to Micrel, the Court hereby **DENIES** Micrel's Motion for New Trial (**ECF No. 167**).

### III.

As the prevailing party in this case, TRW has filed a bill of costs seeking $113,325.19.  *ECF No. 181*.  Micrel objects to costs that TRW is seeking for videotape depositions, printing fees, witness fees and exemplification fees.  *ECF No. 182*.

Federal Rule of Civil Procedure 54(d) establishes that the prevailing party in a civil case shall be allowed to recover its costs unless the court directs otherwise.  *BDT Prod., Inc. v. Lexmark Int'l, Inc.*, 405 F.3d 415, 417 (6th Cir. 2005).  "The Sixth Circuit has indicated that Rule 54(d) creates a presumption that costs should be awarded in favor of the prevailing party, and that the District Court retains limited jurisdiction to disallow costs."  *Watkins & Son Pet Supplies v. The IAMS Co.*, 197 F.Supp.2d 1030, 1035 (S.D. Ohio 2002) (citing *White & White v. Am. Hosp. Supply Corp.*, 786 F.2d 728, 730 (6th Cir.1986)).

-19-

The costs that may be taxed are specified in 28 U.S.C. § 1920:

> A judge or clerk of any court of the United States may tax as costs the following:
>
> (1) Fees of the clerk and marshal;
>
> (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
>
> (3) Fees and disbursements for printing and witnesses;
>
> (4) Fees for exemplification and copies of papers necessarily obtained for use in the case;
>
> (5) Docket fees under section 1923 of this title;
>
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

> A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree.

*Id.* The Court has broad discretion in determining whether to allow or disallow the items listed in § 1920 as costs. *BDT Prod., Inc.*, 405 F.3d at 419 (citation omitted).  Micrel bears the burden of persuading the court that a particular cost is improper.  *Id.* (citation omitted).

**A.**

Under § 1920(2), TRW seeks $40,998.90 in deposition and stenographic fees, including costs associated with taking videotape depositions.[8]  *ECF No. 181, Schedule A, Exs. 1-29.*  "Ordinarily, the costs of taking and transcribing depositions reasonably necessary for the litigation are allowed to the prevailing party.  Necessity is determined as of the time of taking,

---

[8]Micrel also objects to the cost of "realtime/livenote" for the depositions.  According to TRW, it was Micrel that requested these services at the depositions, and Micrel should have already paid, or reimbursed TRW, for those charges.  *ECF No. 183*, at 3 n. 1.  The Court takes this allegation as true since Micrel has not challenged it.

and the fact that a deposition is not actually used at trial is not controlling." *Sutter v. Gen. Motors Corp.*, 100 Fed. Appx. 472, 475 (quoting *Sales v. Marshall*, 873 F.2d 115, 120 (6th Cir.1989)).

TRW contends that a number of witnesses were presented at trial by videotape, those witnesses were unavailable for live examination and could not be compelled to testify because they were outside the 100-mile radius from the Court; the depositions were recorded by videotape because TRW had no way of knowing in advance which witnesses Micrel would voluntarily produce live at trial; and TRW was required to produce to the Court and counsel a transcript of each of those depositions under Fed. R. Civ. P. 26(a)(3)(B), and 32(c). *ECF No. 183*, at 3-5. Micrel does not argue that the costs associated with the videotape depositions were unnecessary, but that § 1920(2) limits the costs that TRW can recover from such depositions to the cost of the deposition transcript pages, exhibits and court reporter fees. *See ECF No. 182*, at 2-3. In support of this position, Micrel cites cases outside the Sixth Circuit. *Id*. at 2 (citing *Cherry v. Champion Int'l Corp.*, 186 F.3d 442, 449 (4th Cir. 1999) and *Barber v. Ruth*, 7 F.3d 636, 645 (7th Cir. 1993)). However, the Sixth Circuit recently rejected this position in a reported decision and held that the costs associated with taking videotape depositions, beyond the costs of transcription, are taxable under § 1920(2). *BDT Prod., Inc.*, 405 F.3d at 420 (citation omitted). Accordingly, Micrel's objection is overruled.

## B.

TRW seeks $35,283.41 in photocopying fees under § 1920(4), supported by invoices. *ECF No. 181, Schedule B, Exs. 1-33*. "The cost of photocopying documents necessarily obtained for use in the case are taxable under § 1920(4)." *Wilhelm v. CSX Transp., Inc.*, No. 3:00 CV

-21-

7099, 2005 WL 361482 (N.D. Ohio Feb. 14, 2005). "The cost of copying pleadings, exhibits, documents, and all necessary papers is recoverable. *Id.* (citing *State of Illinois v. Sangamo Constr. Co.*, 657 F.2d 855, 867 (7th Cir. 1981). *See also Arachnid, Inc. v. Valley Recreation Prods., Inc.*, 143 F.R.D. 192, 193 (N.D. Ill. 1992) ("Photocopying charges attributable to discovery and the court's copies of pleadings, motions and memoranda are reasonably necessary for use in the case and can be awarded.").

Micrel argues that the Court should disallow the entire amount because the invoices TRW provides are insufficiently specific, do not provide any justification for the large amount sought, and the affidavit in support, stating generally that the costs were necessarily incurred in this case, is inadequate. In response, Attorney Mark Savage has provided a supplemental affidavit stating that $33,383.02 of TRW's copying costs were incurred at Squire Sanders and Dempsey's in-house copying facilities. *ECF No. 183, Ex. 4* ¶ 4. He explains the manner by which in-house copying costs are tracked, *id.* ¶¶ 5-9, and attests that the invoices reflect TRW's actual expenses for the copying of documents for use in this case, and that those costs were necessarily incurred, *id.* ¶ 9-10. With respect to the remaining amount, TRW states that one invoice (Tab 12) is a third-party vendor invoice itemizing the quantity of documents and the particular charges, and that Tabs 13 and 17 are letters from National Semiconductor's counsel and Micrel's counsel, respectively, requesting reimbursement for copies of third-party records provided in response to Micrel's subpoenas. *ECF No. 183*, at 8 n. 4.

The Court notes that this was a hotly contested lawsuit fought by two large corporations over three years. The case involved numerous claims and counterclaims. Several dispositive motions were filed and fully briefed, along with dozens of deposition transcripts and exhibits in

support.  The case proceeded to trial, necessitating the filing of numerous trial documents, exhibits, and motions in limine which were also fully briefed.  Mindful of the voluminous record, the number of witnesses necessarily deposed, the breadth of discovery and the length of time this case was pending, the Court concludes that Micrel has failed to rebut the presumption that these printing costs were reasonable and necessary.[9]  Accordingly, Micrel's objection is overruled.

## C.

TRW seeks witness fees in the total amount of $3,065.73 for the trial attendance of its employees, George Backos, Ken Kaiser and Phil Roberts.  *ECF No. 181*, at 2.  The fees sought for George Backos alone, who was the corporate representative present at TRW's trial table every day for ten days, is $2007.00.  *ECF No. 181*, at 2.  Mr. Backos testified as a witness on only two of those days:  July 18 and 20.

Micrel argues that none of these fees is recoverable because parties may not recover witness fees for their own trial attendance, citing in support of its position a Seventh Circuit case and a case from an Illinois district court.[10]  *See ECF No. 182*, at 4.  TRW contends that the entire amount is recoverable because none of the witnesses was a party, all of them attended for the sole purpose of testifying, and none of them attended for the purpose of managing the litigation. *ECF No. 183*, at 9.

---

[9]The Court also notes that TRW's per page charge for photocopying ($0.15 per page) is more than reasonable.  *Cf. Wilhelm*, 2005 WL 361842 at *1 (finding 25 cents per page reasonable).

[10]The Seventh Circuit case that Micrel cites in support of its position that such fees are not recoverable suggests just the opposite, i.e., the fees a party expends for witnesses to attend trial to testify, but not to manage it, are recoverable.  *See Barber v. Ruth*, 7 F.3d 636, 646 (7th Cir. 1993).

-23-

The Sixth Circuit has held that a corporation that is a prevailing party may recover fees for the appearance of its corporate officers and directors at trial. *Soberay Machine & Eq. Co. v. MFR Ltd., Inc.*, 181 F.3d 759, 770 (6th Cir. 1999).  However, those costs are limited to days spent in transit, testifying or waiting to testify and not in advising counsel. *Id.* (citations omitted).

Based on *Soberay Machine*, the Court finds as a matter of law that the costs for Mr. Kaiser and Mr. Roberts are taxable to Micrel (i.e., $1,058.73).  In addition, the Court has reviewed Mr. Backos' expenses and has determined that Mr. Backos' expenses for appearing as a witness from July 18 to July 20 are taxable to Micrel, in the amount of $705 (i.e., $120 representing witness fees for three days; $147 for transit; and $438 for subsistence, which represents 3/10 of the requested $1460).  The total witness cost taxable to Micrel is $1,763.73.

**D.**

TRW seeks $26,506.79 for its multimedia presentation of exhibits at trial.  It seeks this amount as an "exemplification" fee under §1920(4) on the authority of *Cefalu v. Village of Elk Grove*, 211 F.3d 416 (7th Cir. 2000).  Micrel, which used a similar multimedia presentation at trial and split the costs for renting the multimedia equipment with TRW, argues that such presentations are not taxable as exemplification fees under § 1920(4) on the authority of *Arcadian Fertilizer, L.P. v. MPW Indus. Serv., Inc.*, 249 F.3d 1292 (11th Cir. 2001).  There is no Sixth Circuit case on point.  However, the Court's analysis will begin with a Supreme Court case, *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437 (1987).

In *Crawford Fitting*, the Supreme Court was asked to determine whether a district court had the discretion under Rule 54(d) to award to a prevailing party its expert witness fees in excess of the statutory maximum limit of $30 per day, and concluded that it did not.  The Court

-24-

found that 28 U.S.C. § 1920 embodied Congress' choice as to the types of expenses that a federal court may tax as costs against the losing party;  that the witness fee specified as a taxable cost in § 1920(3) was defined in 28 U.S.C. § 1821(a) and limited to a payment of $30 per day under § 1821(b);  and that Rule 54(d) provided that the cost shall be taxed against the losing party unless the court directs otherwise.  *Id.* at 440.  The Court reasoned that if Rule 54(d) granted district courts the discretion to tax whatever costs may seem appropriate, then § 1920, which enumerates the costs that may be taxed, "serves no role whatsoever."  *Id.*  The Court concluded that it could not accept an interpretation of Rule 54(d) that would render any of these specific statutory provisions entirely without meaning.  *Id.* at 442.

In *Arcadian Fertilizer* (Micrel's case), the Eleventh Circuit reversed an award of exemplification costs to the prevailing party for video exhibits and computer animation which the district court found "especially helpful to the jury."  *Id.*, 249 F.3d at 1294.  The Eleventh Circuit rejected the broad definition of "exemplification" found in Webster's Dictionary (a showing or illustrating by example) in favor of the legal meaning of "exemplification" found in Black's Law Dictionary (an official transcript of a public record, authenticated as a true copy for use as evidence).  The Eleventh Circuit adopted the narrower definition of exemplification based on *Crawford Fitting.  Id.* at 1296 (citing 482 U.S. 437 (1987)).

In *Cefalu* (TRW's case), the district court denied the prevailing party's request for $27,000 for the cost of its multimedia presentation under § 1920(4), explaining that the costs for exemplification are permitted only for expenses associated with the physical preparation of exhibits and that, although the multimedia presentation facilitated the presentation of various exhibits to the jury, it played no role whatsoever in the production of the exhibits used at trial.

*Id*. at 427.  The Seventh Circuit reversed this ruling, favoring the broader definition of exemplification in Webster's Dictionary over the restrictive definition found in Black's Law Dictionary.

Although the Sixth Circuit has not spoken on this issue, there are two cases which provide some guidance.  *Kohus v. Toys "R" Us, Inc.* is a patent infringement case that was tried in the Southern District of Ohio and appealed to the Federal Circuit Court of Appeals.  282 F.3d 1355 (Fed. Cir. 2002).  In *Kohus*, the Federal Circuit reversed a district court award of $12,950 to the prevailing party for a video exhibit it presented at trial.  The court noted that, in the absence of Sixth Circuit authority on point, it must determine how the Sixth Circuit would likely resolve the issue taking into consideration cases in other circuits.  *Id*. at 1357-58.  The appellant argued that the district court abused its discretion in awarding these costs absent any statutory authority, citing in support *Crawford Fitting*,  *Arcadian Fertilizer*, and *Swan Carburetor Co. v. Chrysler Corp.*, 149 F.2d 476 (6th Cir. 1945) (Sixth Circuit reversal of district court decision awarding costs to a prevailing party for physical models presented at trial).  *Id*. at 1358.  Appellees argued that exemplification should be broadly construed to include all kinds of demonstrative evidence, citing *Cefalu*.  *Id*.  The court rejected appellees' contention that "exemplification" should be broadly construed because (1) no Sixth Circuit case supported such an expansive interpretation of the term, (2) *Crawford Fitting* supported a narrower interpretation of the term, and (3) Congress could have, but did not, use the broad term "demonstrative evidence" in § 1920(4).  *Id*. at 1359.

More recently, a sister court addressed the issue of whether expenditures relating to preparing and presenting videorecorded testimony and demonstrative exhibits were taxable

under § 1920(4).  *American Trim, LLC v. Oracle Corp.*, 230 F.Supp.2d 803 (N.D. Ohio 2002)

(Carr, C.J.).  The district court noted that there was a split among the circuits with regard to

whether expenses incurred in presenting demonstrative exhibits could be recovered – citing both

*Arcadian Fertilizer* and *Cefalu*.  *Id*. at 807-08.  The court concluded:

> To be compensable a particular expense must fall into one of the categories of costs statutorily authorized for reimbursement.  *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 441-42, . . .  (1987).  Section 1920, adopted before the development and deployment in our courtrooms of technological innovations intended to enhance jurors' comprehension of the evidence, simply does not speak to those innovations.  Absent an amendment to § 1920, courts should not expand the statute's scope beyond its express authority.  *See Arcadian Fertilizer*, 249 F.3d at 1297-98 ("Until Congress sees fit to amend the language of § 1920 to include the innovative technologies currently used in the production of demonstrative exhibits, computer animations and videotape exhibits are not taxable because there is no statutory authority.").
>
> In general, each litigant bears its own expenses and fees.  Section 1920 creates a limited exception to this principle.  As such, it should not be expanded judicially.  Expansion of the statute's scope is for Congress, not the courts, to accomplish.

*Id*. at 808.

There is no question that the parties' multimedia presentations were effective in

simplifying and effectively communicating their case to the jury, and that such presentations are

the wave of the future given the trend toward electronic courtrooms which take advantage of the

latest advances in technology.  However, the Court concludes that a judicial interpretation

expanding the meaning of § 1920(4) to include multimedia presentations is contrary to the

dictates of *Crawford Fitting*, *Kohus* and *American Trim*, and would tread upon the prerogative of

Congress.  Accordingly, Micrel's objection is well-taken.

**E.**

Based on the foregoing, the Court concludes that TRW's costs are taxable to Micrel in the amount of $85,516.40.

**IV.**

For all these reasons, Micrel, Inc.'s Motion for New Trial (**ECF No. 167**) is **DENIED**; and the Clerk of Court is directed to tax costs to Micrel in the amount of **$85,516.40**.

**IT IS SO ORDERED.**

*/s/Judge Dan A. Polster    12/22/2005*
**Dan Aaron Polster**
**United States District Judge**